The bill states that the complainant made at entry for 5000 acres of land lying on the south side of Duck River, on the west fork of the second creek above Gen. Green's land, beginning near *Page 504 
the fork of said creek, running up both sides of said fork for complement. That the defendant, in virtue of a younger entry, has made a survey and obtained a grant, including a part of the land covered by complainant's entry; that if complainants' land is surveyed in a square it will take about 493 acres of the land included in defendant's grant, and if surveyed in an oblong, running up the creek, it will include about 1600 acres. That although complainant's entry was the eldest, the surveyor has refused to survey it; that Dallum has commenced an ejectment, and is about to recover and turn him out of possession, prays an injunction, c.
Dallum's answer denies that the entry of complainant, if surveyed according to its calls, will interfere with his grant, and insists that the entry is vague and uncertain, and that, as complainant has obtained no grant upon his entry, a court of equity can give no relief.
The proof shows, that the surveyor was willing to survey Kendrick's land, beginning where Kendrick wished, laying the survey in a square, to which Kendrick was unwilling, insisting that it ought to be surveyed in an oblong. That the creek on which this land lies is the second on the south side of Duck River, above Green's land; that in going up the creek, Silver Creek, Hurricane Creek, and Brush Creek, empty themselves into it before you reach the fork claimed as Kendrick's beginning; that each of these streams, at their mouths, have the appearance of branches bearing but little proportion as to their width or quantity of water to the main creek. At the place claimed by Kendrick as his beginning, two streams unite, of about the same size, and each containing about the same quantity of water; pursuing the westwardly stream of those two, it again divides into two streams of about equal size. The whole of this stream from its mouth to the source of this large western fork, is at present called Fountain Creek by some; by others, this large west fork is called Fountain Creek; by all, the stream below this main fork is called Fountain Creek.
Upon this case it has been urged, for the defendant, that the complainant's entry is so vague that no *Page 505 
subsequent enterer could tell at-which of its forks the land was intended to lie.
Kendrick has not called this creek by any name in his entry; indeed whether at the time his entry was made it had any name by which it could be distinguished, is not satisfactorily proved, nor is it material, as Kendrick has relied entirely upon description to ascertain, not only the stream, but the part of the stream, on which his land is to lie. The question is, whether he has given such a description that any person seeing this entry, and acquainted with the country, could by reasonable industry have found the place designed to be appropriated.
Taking it for granted that Green's land on Duck River was notorious (and so the parties seem to consider it), we have a point from which to commence our examination; the second creek emptying in on the south side, is the one on which the land claimed does lie. A man on this stream, in search of the west fork, would most probably commence his examination at the mouth, as the calls of the entry would naturally lead him there, — suppose him to proceed up the creek until he became acquainted with the different divisions in this stream, which would he as a reasonable man fix upon? It seems clear to me he would fix upon the one now claimed by Kendrick. Silver Creek, Hurricane Creek, and Brush Creek, are all small streams, would be considered branches, and when he came to the place where each of the uniting streams bear a considerable proportion to each other, he would consider that the fork intended, and would take, the westwardly fork on which to place the land. If there are various forks, one large the others small, and the fork is called for, without distinguishing which we would naturally conclude the main or principal one was intended, the one which would be most likely to attract attention; upon the same principle, if there be several west forks to this stream, one large and the others small, when the west fork is called for, we would suppose the largest, the main or principal western fork, was intended. Indeed, it appears to me, that the counsel have correctly said that these small streams would no more be considered forks than the small limbs on a tree, *Page 506 
or small paths making into a highway, would be so considered. If, then, we have thus ascertained the fork on which the land is to be situated, we can have no difficulty in fixing the beginning point. As the complainant calls to begin near the fork, without any other description of his beginning point, he ought to begin at the fork. I have no doubt but that Kendrick's land does lie at the place he claims, and it seems to me that his land is so described in his entry, that any man acquainted with the objects called for could, with reasonable industry, find the spot fixed on for his beginning.
These points being thus ascertained, it has been insisted, for the complainant, that he had a right to direct the surveyor to run an oblong up the west fork, while on the other side it is said the surveyor has a right to survey in a square if he chooses.
I am of opinion that a citizen who wishes to acquire a title to land has a right to direct the surveyor, whether his land shall be surveyed in a square or oblong; but still the question recurs, at what time and in what manner is this direction to be given? As I believe when the entry is made, and by the description which he gives of his land in the entry itself. By the Acts of 1777, c. 1, § 10; 1784, c. 14, § 7, the surveyor is directed to survey upon the lands entered, and as near as may be according to the calls of the entry. He is to survey in a square or oblong. From these sections, I am impressed with the belief that, in making the survey, the surveyor is to be governed by the directions in the entry itself. If the individual wished his land run in an oblong, he ought to have used such expressions in his entry as would manifest that wish; he ought either to have said so expressly, or called for objects so distant from each other as would compel an oblong for the inclusion of those objects. It seems to me that the legislature intended to prohibit the surveyor from running the survey more than twice as long as wide, even if the calls of the entry should require it, unless there was some necessity for doing so, by natural boundaries or prior claims interfering. If the party does not in the face of his entry show that he intended to have his land surveyed in an oblong, he cannot compel the *Page 507 
surveyor by any after-directions so to survey it; he has his election to survey either in a square or oblong, at his pleasure; and if, from the words of the entry, the surveyor is left at liberty to run the laud in an oblong or square, as he may choose, and he does elect to run it in an oblong, and thereby an interference with a younger entry is produced, I am not prepared to say that the younger enterer is to be injured by such interference; that is a question which I shall not decide at this time.
By examining the Acts of 1777, c. 1, § 5; 1779, c. 6, § 6; 1783, c. 2, § 11; 1784, c. 15, § 3, and c. 19, § 6; 1785, c. 10, § 1; 1786, c. 20, §§ 1, 7, and 1787, c. 23, § 1, it seems to me that it will clearly be discovered that the legislature intended that the enterer of land should, in the face of his entry, give such a description of it as would enable the surveyor and all subsequent enterers, with reasonable exertions, to ascertain where it lay, that the surveyor might be able to survey it, and subsequent enterers know how to avoid it in making their entries; and that, after this entry is thus made, the individual was not intended to have any interference in causing his grant to be obtained, or in directing how the land should be surveyed, except in the case pointed out in the Act of 1778, c. 3, § 7, where the surveyor is ordered to run dividing lines according to the agreement of the parties. The legislature, by compelling the surveyor to survey agreeably to the directions of the claimants in this particular case, have intimated pretty clearly that they did not intend he should be governed by them in any other case.
The enterer in this case, not having shown by his entry that he intended his land should be run in an oblong, had no right at any subsequent period to direct the surveyor on that point; and if by surveying in a square, an interference with Dallum would be avoided, I should think the bill ought to be dismissed; but that it seems would not be the case, there would still be an interference of nearly 500 acres; I am of opinion that we ought not to dismiss the bill, because, —
1st. This is a case that would have been perplexed and doubtful at law, and therefore the complainant *Page 508 
had a right to come into this court and have his case settled. 2 Com. Dig. 481, 483, 489, 491; 1 Ves. Jr. 424. Again, the entry itself vests an equitable right to this land, and upon general principles, I believe the complainant might come here for relief, and that we can retain the cause. Let the complainant have his survey made; and obtain his grant; when this is done we can perpetually enjoin Dallum from taking possession of that which, by complainant's entry, he has a right to hold.
ORIGINAL NOTE. — At February term, 1813, a supplemental bill was filed, which disclosed that Kendrick's claim had been surveyed, and a grant obtained thereupon since the interlocutory decree, and that this survey had been made in an oblong, running up the west fork. During the same term, the principle question in the case of Kendrick and Dallum, came before the Court in the case of Boss v. Brown, on a caveat; Brown had an entry dependent on three others; viz., No. 1605, John Hardin, 5000 acres, April 21, 1784, beginning at the twelve-mile tree on the continental line, running east two and a half miles, thence south for complement, including Hardin's Creek, in Greene county. No. 1607, same day, James and Mathew Kuykendall entered 1600 acres on Hardin's Creek, in Greene county, adjoining John Hardin's entry. No. 1605, running down the creek for complement. No. 1609, same day, Abraham Kuykendall entered 2800 acres joining James and Mathew Kuykendall's entry on Hardin's Creek, running down said creek for complement. The entry of the defendant was made on the same day, No. 1611, for 5000 acres, lying on Hardin's Creek, joining Abraham Kuykendall's entry, No. 1609, running down said creek for complement.
A grant had been obtained on Hardin's entry, and the Court were satisfied that its calls were established. It was not ascertained what disposition had been made of the entries 1607 and 1609, the Court were not informed whether they had been removed, or whether the entries still remained to be surveyed. It seemed to be admitted that they had as yet neither been surveyed nor granted. In making the defendant's survey, Hardin's grant was laid down, and space left for the two entries 1607 and 1609, between Hardin's and the defendant's; and this space was ascertained by laying down squares for each tract adjoining, and placing Hardin's Creek in the middle of the upper line of each. The defendant's entry was surveyed on the lower side of No. 1609. It was shown by the facts found by the jury, that if the entries 1607 and 1609 were surveyed in oblongs down the creek, at the places they were respectively claimed, and the defendant's entry to adjoin No. 1609 below, it would not include the land in controversy, nor would the defendant's claim interfere with the plaintiff more than seventy-two acres, after a removal of 1200 acres of it, which had taken place; provided the entries 1607 and 1609 were surveyed in oblongs across the creek at the places where they are respectively claimed. The interference complained of is occasioned by supposing the entries Nos. 1607 and 1609 to be run out in squares as stated above, when the interference would be 600 acres.
HAYWOOD, for the plaintiff, insisted that the defendant's entry was entirely dependent on those to which it referred. It could not be located or ascertained by survey until the Nos. 1605, 1607, and 1609 had been previously surveyed; and if any of these claims were removed all subsequent dependent entries would be lost. It was the enterer's own fault to make an entry to depend on any antecedent claim.
By the Court, WHITE and OVERTON, JJ. — The laws of North Carolina, previous to the Cession Act, must govern this question.[1] Agreeably to those laws, the eldest entry is entitled to the first survey and grant;[2] and moreover, the surveyor may run out each entry either in a square or oblong (to the cardinal points), not exceeding in length twice its breadth, unless prevented by the restrictive calls of such entry, by natural boundaries, or lines of older claims.[3] The time for surveying is still open, — according to law the defendant's entry ought not to be surveyed until some disposition shall be made of the entries Nos. 1607 and 1609, both of which are older than the defendant's. Perhaps these older entries may have been removed; in that case the Court are not of opinion that the defendant's claim should be lost, but, in order to preserve it, they will presume that surveys on them would have been made in a square, placing Hardin's Creek in the middle of the upper line of each tract. But suppose these entries are still to be surveyed, it is uncertain in what manner it will he done, — whether in squares, in oblongs down the creek, or in oblongs across the creek. Surveys in any of these ways would be legal as it respects the defendant's younger entry, and until these elder entries be first surveyed, which the law expressly requires, the Court cannot say whether there would be any interference or not; or, if any, the precise quantity.
It was suggested that the entries Nos. 1607 and 1609 had been removed, upon which, and on motion of the defendant's counsel, the Court remanded the cause to the Circuit Court, to have that fact ascertained.
[1] 1807, c. 2, §§ 38, 40.
[2] 1783, c. 2, §§ 18, 19, 20; 1786, c. 20; 1787, c. 23; Nov. 1777, c. 1, § 10; April, 1778, c. 3, §§ 2, 7; April, 1779, c. 6, § 6; Oct. 1779, c. 4, § 7; Nov. 1796. c. 7, § 1; Dec. 1791, c. 21, §§ 1, 2, 3; 1795, c. 17, § 4.
[3] 1783, c. 2, § 19; Nov. 1777, c. 1, § 10; April, 1784, c. 14, § 7; Oct. 1784, c. 19, § 6; Nov. 1796, c. 9. *Page 509